Filed 6/21/22  P. v. Hunter CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LIONEL ANTHONY HUNTER,<br><br>    Defendant and Appellant. | F081746<br><br>(Kern Super. Ct. No. SC065400A)<br><br><br>**OPINION** |

**THE COURT**<sup>*</sup>

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

<sup>*</sup> Before Detjen, Acting P. J., Franson, J. and De Santos, J.

**INTRODUCTION**

In 1996, appellant Lionel Anthony Hunter was convicted after a jury trial of first degree murder (Pen. Code, §187, subd. (a))[1] with a gang enhancement (§ 186.22, subd. (b)(1)). He was sentenced to 25 years to life, plus three years for the enhancement. In 1998, this court affirmed the judgment on direct appeal, and his petition for review was denied.

In 2019, appellant filed a petition for resentencing pursuant to section 1170.95, and asserted he was not the actual killer, he was convicted under the felony-murder rule and/or the natural and probable consequences doctrine, and he could not be now convicted of first or second degree murder because of the amendments to sections 188 and 189. In 2020, the superior court summarily denied the petition.

On appeal, appellant argues the matter must be remanded because the court failed to conduct a hearing and state reasons to explain why it denied his section 1170.95 petition, and the errors were prejudicial because he was tried under the natural and probable consequences doctrine. We find the court's statutory errors were not prejudicial and affirm because he was ineligible for relief as a matter of law

**FACTS[2]**

On the evening of November 3, 1995, David ("Pimp Dog") Forrest, Patrick ("Fat Pat" or "Gangster Fan Pack") Hull, Lorraine Murphy, and about 15 to 20 others were

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] This court granted appellant's motion to augment the appellate record with the transcripts from his 1986 jury trial. The augmented clerk's transcript contains the minute orders and jury instructions from appellant's trial. The superior court's supervisor of court reporters filed a declaration that the reporter's transcripts for the trial were for dates beyond the statutory requirements to maintain the records.

This court, however, retained copies of the reporter's transcripts from his jury trial. On August 6, 2021, this court granted appellant's unopposed request to take judicial notice of this court's record and the nonpublished opinion filed in his direct appeal from his jury trial, including the reporter's transcripts, in *People v. Hunter* (June 25, 1998, F026814).

2.

standing outside Norm's Market on the comer of 8th and L Streets in Bakersfield. Forrest and his friends were associated with the Warlord Blood gang, and the market was a Blood hangout.

Forrest entered the market and bumped into Wenoka Johnson as she walked out of the door. Wenoka was an associate of the Westside Crips, a rival gang. Wenoka told Forrest the market was Westside Crip territory and Forrest laughed. Wenoka voiced her surprise that Forrest was still alive because Forrest had been shot on two previous occasions. Forrest replied that he was still around, and Wenoka said, " 'You should have been dead a long time ago, Pimpy Dog.' " Forrest pushed Wenoka, and she hit Forrest. They shoved each other around, and Wenoka finally walked away.

Wenoka walked to the residence of Makima Green, about four blocks from the market. She told Green about the altercation and said Forrest hit her. Green told Wenoka to call the police, but she declined and walked away.

That same evening, Tonya Boyd drove her boyfriend, Latimore Hunter (Latimore), and his brother, appellant Lionel Anthony Hunter, to the residence of Boyd's grandmother to eat dinner and spend the evening. The residence was near Norm's Market. Both appellant and Latimore were associated with the Westside Crips. At some point, Boyd and Latimore realized appellant had left the residence but did not see him leave with anyone.

Forrest and his friends remained outside Norm's Market, and they were joined by 13-year-old Connie White and her brother. Connie's brother was associated with the Warlord Bloods.

---

The following factual and procedural summaries are from the instant appellate record and the record and nonpublished opinion in his direct appeal. As will be explained below, we provide the factual summary for background purposes but will not rely on these facts to resolve the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

About 15 minutes after the altercation between Forrest and Wenoka, the group noticed a gold sedan slowly drive past the market. Forrest and Hull recognized the vehicle as belonging to Eugene "Nu Nu" Boy, a Westside Crip who was friendly with some of the Bloods.

Forrest testified that appellant was driving the vehicle, and two people were in the driver's side of the back seat. Hull also saw three people in the vehicle as it approached the market, but he thought Latimore was driving.

As the gold sedan approached Forrest and his friends, a rifle barrel appeared from the driver's side of the back seat and a single shot was fired. Many of the people turned for cover when the shot was fired. Forrest was standing about 15 feet from Connie when the shot was fired.

Lorraine Murphy testified the vehicle drove by the market twice. The first time, it drove by "like a normal car." When it came by the second time, it went more slowly as it passed the crowd outside the market, and the shot was fired. After the gunshot, the vehicle "took off fast" and left the area. Forrest testified the vehicle was going five to 10 miles an hour when it approached the market, and the gunshot was fired.

Connie was fatally wounded by the bullet, which entered her back and hit the lowest rib. The bullet broke into fragments and passed through her spleen, diaphragm, left lung and heart. The fragments spread through her stomach, kidney, and pancreas, and some of the fragments exited through her chest. The path of the bullet was consistent with Connie standing with her back to the street as the shot was fired. The manner in which the bullet broke into fragments was consistent with a high velocity projectile fired from a rifle.

After the single shot was fired, the gold sedan drove away, and the scene erupted in chaos. At 7:40 p.m., the police and paramedics responded to the scene, but Connie died of severe hemorrhaging from the internal injuries. The officers investigated the immediate area of the shooting and recovered part of the bullet which passed through

4.

Connie and inflicted her fatal injuries. The slug was torn and jagged, consistent with the manner in which a high velocity bullet breaks into fragments when it hits something hard.

The police interviewed several witnesses at the scene and obtained information about the suspects. The witnesses were wearing gang colors, and they were reluctant to cooperate because of the rivalry between the gangs. Lorraine Murphy believed appellant, Latimore, and Tyrone "Zig Zag" Murphy were in the car and thought she had seen appellant driving the vehicle the previous day.

Shortly after the shooting, Patrick Hull and some of the Bloods found "Nu-Nu's" gold sedan abandoned in a nearby alley, and they punctured the tires to prevent anyone from moving the car. Hull and his friends led the officers to the vehicle and identified it as the vehicle used in the shooting. The entire interior of the vehicle had been doused with gasoline, and because of the gasoline, the police were unable to obtain any fingerprints. However, the police recovered one clean fingerprint from the outside rear view mirror on the driver's door, and it belonged to appellant. The fingerprints of Eugene "Nu Nu" Boyd or Latimore were not recovered from the vehicle.

The officers found an expended shell casing for a Russian 7.62 x 3.9-caliber bullet in the middle of the vehicle's front seat, consistent with a weapon being fired from inside the car. The distinctive caliber shell casing was also consistent with being fired from a high velocity rifle or carbine, such as an AK-47 or SKS carbine, rather than a handgun or pistol.

In the meantime, appellant returned to the gathering at the residence of Boyd's grandmother. Appellant and Boyd left in her car, and appellant asked Ms. Boyd, "How do you get gunpowder off your hands?" Ms. Boyd asked why he wanted to know. Appellant replied, "Me and Wenoka did a drive-by."

On the morning of November 4, 1996, officers arrived at the apartment of appellant's girlfriend. She stated that appellant was not there and allowed the officers

5.

inside. The officers found appellant behind the door of the children's bedroom, and he was taken into custody.

During the search of the apartment, the officers recovered a box from the bottom of the kitchen trash can which contained nine loose, 7.62 x 39-caliber rifle rounds. The officers recovered a sealed package of ten 7.62 x 39-caliber rifle rounds in a kitchen cabinet. They never recovered the weapon used in the shooting.

**Latimore's Statements**

Latimore, appellant's brother, was also arrested that morning. He initially told the police he was not involved in the shooting and did not know anything about it; he offered an alibi for appellant.

Latimore subsequently said appellant possessed an AK-47, and that appellant admitted he did the drive-by shooting with Wenoka. Appellant told Latimore that they used an AK-47 and "Nu Nu's" car, and a little girl was hit. Latimore also stated he saw appellant with Wenoka that night.

After Latimore was released from custody, he voluntarily gave an interview to a local television station, and stated appellant admitted he did the drive-by shooting with Wenoka.

Prior to trial, Patrick Hull was interviewed while he was in custody for an unrelated offense. Hull initially believed Latimore was the driver of the gold sedan, but he confused the names of the brothers. Hull clarified the driver had a "dead eye," which fit appellant's description. Hull also stated that Tyrone "Zig Zag" Murphy and Wenoka were in the back seat of the driver's side, and Wenoka was looking over Murphy's shoulder when the shot was fired. As the gold sedan approached the corner, Wenoka shouted a derogatory term at the Bloods. Hull stated the rifle barrel emerged from the back seat, and the shot was fired. Hull was not sure if Wenoka or Murphy fired the gun. Hull was sure Latimore was not in the car. Hull said he feared retaliation from other gang members for cooperating with the investigation.

6.

**Appellant's Statement**

Appellant initially told the police that he was with Latimore the entire evening. Appellant denied any involvement in the shooting but admitted he drove "Nu Nu's" gold sedan the day before the shooting.

Appellant subsequently admitted his involvement in the drive-by shooting. Appellant stated that he drove "Nu Nu's" car while Wenoka fired an AK-47, using the same type of ammunition recovered from appellant's apartment. Appellant thought Wenoka was just going to use the gun to "fake out" the group, which the interviewing detective believed meant to "make you believe one thing's going to happen and it doesn't."

**Additional Trial Testimony**

At appellant's trial, David Forrest repeated his identification of appellant as the driver of the gold sedan. Forrest admitted he had four prior felony convictions for attempted robbery and possession of a firearm.

Patrick Hull testified and denied identifying anyone involved in the shooting. Hull claimed he only identified appellant because he was angry about the incident and insisted that he never saw the driver of the gold sedan. Hull admitted he was in custody for a parole violation, and that he had prior convictions for attempted murder and possession of cocaine for sale.

Tonya Boyd testified that appellant and Latimore were at her grandmother's house on the evening of the shooting. At some point, she noticed appellant had left the house. Later that night, she was leaving the house and saw a cousin drop off appellant. Appellant got into Boyd's car, and they left the grandmother's house. Boyd testified that as she drove to her own house, appellant "mumbled" something to her. Boyd admitted she previously told an investigator that appellant asked her, " '[H]ow do you get gun powder off your hands[?]' " Boyd asked appellant what he did, and initially he did not respond. Boyd testified that appellant said, " 'Me and Wenoka did a drive-by.' "

7.

**Latimore's Trial Testimony**

Latimore testified that he was no longer in custody, and the charges against him were dismissed. In the initial portion of his trial testimony, Latimore admitted he first gave the police a false alibi for appellant. Latimore also admitted he contacted law enforcement officers when he was in custody, said he had not told them the truth, and said that he saw appellant with an AK-47, and that appellant told him that he did a "drive-by" with Wenoka. Latimore admitted appellant told him that he did the drive-by with Wenoka. Latimore admitted he voluntarily contacted a television station and gave an interview.

As his testimony continued, Latimore claimed that he had previously lied in both his pretrial statements to investigators and his initial trial testimony about what appellant said to him, seeing the AK-47, and appellant's involvement in the drive-by shooting. He said that he had made everything up because he was angry at appellant. Latimore also claimed he did not hear what appellant actually said, he was mixed up when he made his statements, and he implicated appellant because he wanted to protect himself, and the police had threatened his family.

Latimore testified he did not know what happened that night, he never saw appellant with Wenoka, appellant did not have an AK-47, and appellant did not admit his involvement in the shooting. Latimore admitted that he had implicated appellant during his television interview but claimed he did it because he was frightened and to save himself.

Detective Legg testified that Latimore initially denied any knowledge about the shooting and gave an alibi for appellant. A few hours later, during a second interview, Latimore said appellant told him that "he had went and done a drive-by and a little girl had got hit," and he used "Nu Nu's" car, referring to Eugene Boyd. Detective Legg testified Latimore called him, gave a third interview, and said appellant was with Wenoka, Latimore had seen appellant with an AK-47 a week before the shooting, and

appellant told Latimore he had done the drive-by and a little girl was hit. Latimore said appellant left the house of Boyd's grandmother, and he saw appellant with Wenoka outside that house before the shooting occurred.

Appellant did not testify, and the defense did not call any witnesses.

## PROCEDURAL BACKGROUND

On January 8, 1996, an information was filed in the Superior Court of Kern County charging appellant with count 1, first degree premeditated murder of Connie White (§ 187, subd. (a)). It was further alleged that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that he personally used a firearm in the commission of the offense (§ 12022.5, subdivision (a)).[3]

On April 30, 1996, appellant's trial began with motions. The court granted the People's motion to dismiss the section 12022.5 firearm enhancement.

**The Jury Instructions**

As relevant to the issues raised in this petition, the jury was instructed with CALJIC No. 2.11.5, not to speculate about unjoined perpetrators.

CALJIC No. 3.00 defined principals to include "[t]hose who aid and abet the commission of the crime." CALJIC No. 3.01 defined aiding and abetting and stated in relevant part:

"A person aids and abets the commission of a crime when he or she,

"(1) *with knowledge of the unlawful purpose of the perpetrator* and

---

[3] The information originally charged appellant's brother, Latimore, as a codefendant in the murder count, with gang and firearm enhancements. Prior to trial, the charges against Latimore were dismissed, and he testified against appellant as a prosecution witness.

Wenoka claimed her privilege against self-incrimination and refused to testify, and the court found her unavailable as a witness. The record is silent as to any charges against her.

9.

"(2) *with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime*." (Italics added.)

CALJIC No. 3.02 defined the liability of principals for "natural and probable consequences."

"One who aids and abets another in the commission of a crime is not only guilty of that crime but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

"In order to find the defendant guilty *of the crime of murder in the first degree*, as charged in Count 1, you must be satisfied beyond a reasonable doubt that:

"(1) The crime of discharging a firearm at another person from a moving vehicle *with the specific intent to kill* was committed,

"(2) The defendant aided and abetted such crime,

"(3) A co-principal in such crime committed the crime of discharging a firearm at another person from a moving vehicle *with the specific intent to kill*, and

"(4) *The crime of murder was a natural and probable consequence of the commission of the crime of discharging a firearm at another person from a moving vehicle with the specific intent to kill*." (Italics added.)

CALJIC No. 3.14 stated:

"Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging or facilitating the commission of the crime is not criminal. Thus a person who assents to, or aids or assists in, the commission of a crime without such knowledge and without such intent or purpose is not an accomplice in the commission of such crime." (Italics added.)

CALJIC No. 8.10 defined count 1, murder, as the unlawfully killing of a human being with malice aforethought "or during the commission or attempted commission of willfully and maliciously discharging a firearm at another person from a moving vehicle,

10.

a felony inherently dangerous to human life….." The elements were that a human being was killed, the killing was unlawful, and "[t]he killing was done with malice aforethought *or occurred during the commission or attempted commission of the crime of willfully and maliciously discharging a firearm at another person from a moving vehicle, a felony inherently dangerous to human life."* (Italics added.) CALCRIM No. 8.11 defined express and implied malice.

CALJIC No. 8.25.1 defined first degree murder:

"Murder which is perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person outside of the vehicle *when the perpetrator specifically intended to inflict death* is murder of the first degree." (Italics added.)

CALJIC No. 8.65 defined transferred intent, and that when one attempts to kill a certain person but by mistake or inadvertence kills a different person, the crime so committed is the same as though the person originally intended to be killed had been killed.

The jury was also instructed on second degree murder as a lesser included offense.

Finally, CALJIC No. 9.05 defined the offense of shooting from a vehicle at a person in violation of section 12034, subdivision (c), as occurring when a person willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle.

**The Prosecutor's Closing Argument**

The prosecutor argued that Wenoka was the shooter, appellant drove the car, and the motive was to retaliate because of Wenoka's altercation at the market with rival gang members. The prosecutor explained that "Pimping Dave" Forrest stood near the victim when the car drove by, and the shot was fired; the bullet hit the victim instead of Forrest.

The prosecutor argued appellant was guilty of first degree premeditated murder as an aider and abettor:

11.

"[W]hen we think of first-degree murder in the traditional sense, we always think of the terms premeditation and deliberation that is associated with the first-degree murder. However, this statute and the law provides that if a murder is committed during the course of a drive-by shooting, that that premeditation and deliberation need not be shown. [¶] What needs to be shown is that a firearm was discharged from a motor vehicle intentionally at another person outside of the vehicle and that the perpetrator specifically intended to inflict death."[4]

The prosecutor acknowledged the evidence showed appellant was not the shooter but explained that he was still guilty of first degree murder as an aider and abettor. The evidence showed appellant "both knew of the unlawful purpose" of Wenoka, and that "he intended to aid or facilitate her commission of the crime." Appellant and Wenoka left the grandmother's house together, and appellant had access to the car that was used. Appellant provided the AK-47 based on his statements to Latimore, the ammunition for that weapon was found in his girlfriend's apartment, the autopsy showed that the victim was hit by this type of ammunition, and appellant admitted in his pretrial statement that such rounds were used to fire at the victim.

The prosecutor further argued the manner in which the shooting occurred was evidence "*not only of Wenoka's intent to kill Pimping Dave, but also of [appellant's] knowledge of that intent*." (Italics added.) "[T]he driver is particularly important in a drive-by shooting to gang members because … it is the driver who's responsible for helping to set up the crime and helping during the commission of the crime." The witnesses reported the car went by the market once, came back, and drove by very slowly when the shot was fired. The coroner's evidence showed the fatal shot was "fired straight on" into the victim's body, the victim was standing in proximity to Pimping Dave, and these facts further showed intent to kill.

---

**4** As will be discussed below, the prosecutor's theory of the case was based on section 189, which establishes a category of murder consisting of "intentional murder by shooting out of a vehicle with intent to kill." (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 163–164.)

"We also know that the driver is very important to a drive-by shooting because they have the responsibility to get the gang members out of the area without being apprehended, without being shot back on by rival gang members. [¶] We know in this case that was accomplished by [appellant]. That he drove that car out of there, that he got out of the area."

The prosecutor acknowledged there was no evidence that appellant or Wenoka intended to kill Connie and explained the doctrine of transferred intent applied because there was the intent to kill Pimping Dave and Wenoka hit Connie instead.

"[T]he evidence … provides more than enough evidence to establish what the knowledge of [appellant] was previous to the killing.

"A loaded firearm, which he knew was possessed by Wenoka Johnson. And we know that he knew that because that was evidence that was received by you.

"The fact that he knew that she was angry and knew that an altercation had occurred previously.

"The fact that with that knowledge, with the knowledge that Wenoka Johnson was angry, with the knowledge of what had occurred, with the knowledge of the possession of a loaded firearm, that vehicle was still driven passed [*sic*] the market and it was driven passed [*sic*] the market by [appellant] very slowly, very slowly so as to facilitate the shooting."

**Defense Counsel's Argument**

Defense counsel argued the prosecution failed to prove appellant's guilt beyond a reasonable doubt and there were evidentiary gaps.

"Now, one of the things that is important and vital in aiding and abetting is the knowledge of the unlawful purpose of the perpetrator. [¶] In other words … in order to find [appellant] an aider and abettor, you have to find that he has knowledge of the unlawful purpose of Wenoka Johnson. And in addition to that you have to find that he had an intent or purpose that is transferred over from Wenoka Johnson."

Defense counsel argued it was not possible to "get inside" Wenoka's head to know her intent, that evidentiary gap could not be bridged, and appellant's presence was not sufficient to find he was an aider and abettor. Counsel conceded that appellant "drove the car" but did not fire the weapon. In his pretrial statement, appellant admitted that he had

13.

driven the car, but counsel pointed out appellant was "almost hysterical" during his interview and questioned whether he would have been crying and upset "if he was all planning and involved in this particular crime." Instead, counsel suggested appellant was crying and upset "because he did not want to be and was not a part of the killing." Appellant also said it was supposed to be a "fake out," which showed he did not know what was going to happen. Counsel dismissed Latimore's pretrial statements and testimony because he was going to "say anything," and pointed out the other witnesses gave multiple statements.

> "[T]he real question in this case … is did [appellant] know Wenoka was going to shoot that night. Question No. 1. I submit to you the answer is no because you have no credible evidence before you that he did. You have no evidence before you that he planned any of this, that he aided and abetted with her, that he encouraged her."

**The Prosecutor's Rebuttal**

The prosecutor argued the circumstantial evidence showed Wenoka's state of mind and intent to kill based on the altercation at the market with rival gang members; she told Pimping Dave that he should have been dead "a long time ago"; other people testified she was very upset and angry about it; she shouted a gang slur just before the gunshot was fired; and the witnesses gave inconsistent statements because of their gang loyalties but eventually disclosed what happened. The prosecutor reminded the jury that in his pretrial interview, appellant admitted he told Latimore he had done the drive-by shooting, he knew Wenoka had the gun, and he knew she wanted to go to the market. The prosecutor also reminded the jury that appellant was not the shooter, but he asked Ms. Boyd how to get gunpowder off his hands because the AK-47 and ammunition belonged to him.

The prosecutor concluded that appellant and Wenoka were Westside Crips with a loaded AK-47 rifle, appellant knew Wenoka had it, and he knew Wenoka was upset because she told everyone about the market incident. Appellant knew Wenoka wanted to

14.

go to the market where the Bloods were, they went there, appellant drove by once so they could check it out, he slowly drove by again, and Wenoka fired. Appellant and Wenoka went to the market "to pay back a disrespect" with a loaded AK-47.

**Conviction and Sentence**

On May 29, 1996, the jury convicted appellant of first degree murder and found the gang enhancement true.

On September 4, 1996, the court held the sentencing hearing. It denied appellant's motion for new trial and sentenced him to 25 years to life for first degree murder, plus three years for the gang enhancement.

**Appellant's Direct Appeal**

On June 25, 1998, this court affirmed the judgment on direct appeal (*People v. Hunter*, *supra*, F026814). We rejected appellant's arguments that the trial court improperly admitted photographs of the murder victim and held the court did not coerce the jury into returning a verdict. Appellant's petition for review was denied.

## APPELLANT'S SECTION 1170.95 PETITION

On or about March 12, 2019, appellant filed a petition for resentencing pursuant to section 1170.95. Appellant was represented by the public defender's office. The petition simply alleged that he was entitled to resentencing pursuant to the provisions of section 1170.95.

**Initial Hearings**

On March 15, 2019, the court convened a hearing and appointed the public defender's office to represent appellant. Mr. Kinzel, the prosecutor, objected that appellant's petition did not comply with the procedural requirements of section 1170.95. The court agreed. Ms. Lolachi, the public defender who made the appearance, stated she did not know the status of the case. The court continued the matter to obtain the appearance of Mr. Kang, the deputy public defender who filed appellant's petition.

15.

On March 20, 2019, the court convened another hearing. Mr. Kinzel was present for the People. Deputy Public Defender Peter Kang appeared for appellant.

The court advised Mr. Kang that the People objected to the petition for failing to satisfy the statutory requirements. Mr. Kang stated he could supplement the petition and continued: "I did have a chance to review Mr. Hunter's file and the case facts, and it does appear that Mr. Hunter does qualify. It was a driver in a drive-by shooting. He neither pointed the gun nor shot a gun. His passenger shot the gun…."[5]

The court asked Mr. Kinzel whether he was willing to waive the formal petition or wanted the defense to file a technically correct petition. Mr. Kinzel replied that it was important to follow section 1170.95's requirements. The court asked Mr. Kang to file the appropriate documents and he agreed.

**Appellant's Supporting Declaration**

On April 3, 2019, appellant filed a declaration under penalty of perjury in support of his petition, stating he was eligible for resentencing because he was convicted of first degree murder based on the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189 because he was not the actual killer, he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of first degree murder, and he was not a major participant and did not act with reckless indifference to life.

---

[5] In this appeal, appellant erroneously attributes these statements to the prosecutor, and asserts this court must accept the prosecutor's "concession" that he was eligible for relief under section 1170.95. As noted by the People, however, appellant's public defender, Mr. Kang, made these statements at the March 20, 2019, hearing; the prosecutor never conceded appellant was eligible. Indeed, the prosecutor first moved to dismiss the petition, and then filed opposition on the merits.

16.

**Further Hearings**

On April 12, 2019, the court held another hearing and acknowledged the petition was properly filed.

On June 13, 2019, the court and the parties agreed to continue to matter because a case was pending before the California Supreme Court that would address section 1170.95. On December 12, 2019, the court again granted the parties' motion to continue.[6]

**The People's Opposition**

On May 1, 2020, the People filed opposition to appellant's petition on the merits of whether he was eligible for relief under section 1170.95. The People attached a copy of this court's opinion in appellant's direct appeal, requested the trial court to take judicial notice of the opinion and the records from appellant's trial, and stated the facts from this court's opinion.

The People argued the trial record showed appellant was tried and convicted as a direct aider and abettor who acted with the intent to kill, he was not convicted under the felony-murder rule or the natural and probable consequences doctrine, there were no underlying felonies alleged or found true, and the jury instructions on transferred intent did not amount to imputed malice.

The People next cited the trial evidence as summarized in its opposition and argued the facts "proved" appellant was a direct participant; the shooting occurred because of the incident at the market; appellant obtained a vehicle and a loaded rifle and drove slowly past the market with others in the backseat; the gun was fired, and while a bystander was killed, the evidence showed he acted with the intent to kill.

---

[6] On May 31, 2020, the People filed a motion to dismiss the petition and alleged Senate Bill No. 1437 was unconstitutional. On June 4, 2019, appellant filed a reply to the motion to dismiss. On March 18, 2020, the court denied the People's motion to dismiss appellant's petition and order the parties to file briefs on the merits.

17.

**Appellant's Reply**

On September 2, 2020, appellant filed a reply to the opposition and submitted the matter based on his previous declaration that he was not the actual killer.

**The Court's Denial of the Petition**

On September 2, 2020, the court issued a minute order that summarily denied appellant's petition. It did not hold a hearing or state reasons.

On September 14, 2020, appellant filed a timely notice of appeal.

## DISCUSSION

**I.    Section 1170.95**

We begin with the provisions of sections 188, 189, and 1170.95, subsequent amendments, and the interpretations of these statutes.

### A.    *Senate Bill No. 1437*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) became effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability."[7] (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

---

[7] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage,

19.

'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**B.**     *Lewis*

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957, italics added in original.)  " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' "   (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.)  When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis, supra*, 11 Cal.5th at p. 968.)

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.)  "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited.  Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved.  If so, the court must issue an order to show cause." ' " (*Ibid*.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in "factfinding involving the weighing of evidence or the exercise of discretion." [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972, fn. omitted.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), if the trial court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' [Citations.]" (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably

probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *Watson, supra*, 46 Cal.2d at p. 836.)

### C. *Senate Bill No. 775*

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id.*, at subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid.*) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid.*)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (§ 1170.95, subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion.* However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

In this case, the court summarily denied appellant's petition before *Lewis* was decided and section 1170.95 was amended by Senate Bill 775. However, the statutory amendments are applicable to his case since it is not yet final on appeal. (See, e.g., *People v. Porter* (2022) 73 Cal.App.5th 644, 652; *People v. Vieira* (2005) 35 Cal.4th 264, 306; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306–309.)

With this background in mind, we turn to appellant's contentions.

## II.     The Court's Failure to Comply with Section 1170.95

Appellant argues the matter must be remanded because his petition was facially sufficient and established a prima facie case for relief, "absent a showing of ineligibility as a matter of law." Appellant argues the record does not establish as a matter of law that he was convicted as a direct aider and abettor with the intent to kill.

We first note that as to the procedural requirements of section 1170.95, appellant was represented by the public defender in the filing and review of his petition for

23.

resentencing. In addition, the court invited further briefing from the parties, the People filed opposition, and appellant filed a response.

However, the court did not conduct a hearing prior to addressing the prima facie issue and did not give a statement of reasons when it denied appellant's petition without issuing an OSC, as required by section 1170.95, subdivision (c). We further note that the People's opposition included this court's opinion in his direct appeal as an exhibit, and it cannot be determined whether the superior court made improper factual findings when it denied appellant's petition since the court did not give a statement of reasons.

To the extent the trial court violated section 1170.95 by denying appellant's petition without holding a hearing, failing to give a statement of reasons when it declined to issue an OSC, and possibly engaging in premature factfinding at the prima facie stage (§ 1170.95, subds. (c), (d)(3)), we may affirm the court's denial of the petition if appellant was not prejudiced by the statutory errors. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.) Appellant must show that absent the statutory errors, there is a reasonable probability he would have obtained a more favorable result. (*Ibid.*; *Watson, supra*, 46 Cal.2d at p. 836.)

We now turn to appellant's claims of prejudicial error.

### III. Appellant was Ineligible for Relief as a Matter of Law

Appellant argues the record fails to establish his murder conviction was based on a theory that remains valid after the enactment of Senate Bill 1437, and the record of conviction shows he was convicted of first degree murder solely based on aiding and abetting and imputed malice under the natural and probable consequences doctrine.

In making this argument, appellant cites to this court's factual statement in the opinion in the direct appeal and argues there was "no direct evidence [he] intended for anyone to be hit by gunfire or killed. Appellant stated he believed Wenoka intended to use the gun only to frighten people." It is now settled that the opinion from a petitioner's direct appeal is part of the record of conviction that may be considered to determine

24.

whether the petitioner made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.) The role of the appellate opinion is circumscribed, however, and the court may not engage in factfinding based on the appellate opinion at the prima facie stage. (*Id*. at pp. 971–972; § 1170.95, subd. (d)(3).) While we have relied on our prior opinion and the trial record for the factual statement, we have done so only to provide context to the parties' arguments, and do not rely on this factual statement to resolve the prima facie issue and whether the court's statutory errors were prejudicial.

The court may rely on procedural history to make the prima facie determination. This includes the jury instructions, which are part of the record of conviction, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion,' " which must wait to occur until after an OSC issues. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis, supra*, 11 Cal.5th 952.)

The record of conviction for purposes of section 1170.95 has also been interpreted to include the parties' closing arguments. (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 935.) "It is elementary, however, that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

We find the court's failure to comply with the requirements of section 1170.95 was not prejudicial because the procedural record shows appellant was ineligible for relief as a matter of law since he was convicted as a direct aider and abettor who acted with the intent to kill.

A.    *Section 189*

"Section 189 establishes three categories of first degree murder." (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 163, fn. omitted.) It "first establishes a category

of first degree murder consisting of various types of premeditated killings, and specifies certain circumstances (use of explosives or armor-piercing ammunition, torture, etc.) which are deemed the equivalent of premeditation.  Section 189 secondly establishes a category of first degree felony murders (murders perpetrated during felonies or attempted felonies such as arson, rape, carjacking, etc.).  *Finally, section 189 establishe[d] a third category consisting of only one item, intentional murder by shooting out of a vehicle with intent to kill.*"  (*Id*. at pp. 163–164, italics added.)

As defined by section 189, the third category of "first degree drive-by murder is not felony murder, and … although premeditation is not required to establish the crime, a specific intent to kill is required."  (*People v. Chavez* (2004) 118 Cal.App.4th 379, 382 (*Chavez*).)  "Although the drive-by-shooting clause appears immediately after the list of enumerated felonies in section 189, it is clear from the content of the clause that drive-by shooting is not part of that list.  The drive-by-shooting clause requires an 'intent to inflict death' which is never an element of felony murder.  Several cases confirm that the Legislature meant what it said when it required an intent to kill in the drive-by-shooting clause."  (*Id.* at pp. 385–386.)

"First degree drive-by murder under section 189 is not felony murder because it requires a mental state that felony murder does not require."  (*Chavez, supra*, 118 Cal.App.4th at p. 386.)  "[T]he drive-by-shooting clause added to section 189 in 1993 is not an enumerated felony for purposes of the felony-murder rule.  We further conclude that although premeditation is not required to establish first degree murder under this clause, a specific intent to kill is required.  And, as is well established, proof of an unlawful intent to kill is the functional equivalent of express malice."  (*Id*. at pp. 386–387.)

As relevant to the instant case, the amendments enacted by Senate Bill 1437 did not change the drive-by shooting language in section 189, subdivision (a), that continues to define first degree murder as "*murder that is perpetrated by means of discharging a*

*firearm from a motor vehicle, intentionally at another person outside of the vehicle with*
*the intent to inflict death ....*" (§ 189, subd. (a), italics added.)

**B.** ***Direct and Indirect Aiding and Abetting***

"Generally, a defendant may be convicted of a crime either as a perpetrator or as an aider and abettor. [Citation.] An aider and abettor can be held liable for crimes that were intentionally aided and abetted (target offenses); an aider and abettor can also be held liable for any crimes that were not intended, but were reasonably foreseeable (nontarget offenses). [Citation.] Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ' " 'natural and probable consequences' doctrine." ' " (*In re Loza* (2018) 27 Cal.App.5th 797, 801, fn. omitted; *People v. Williams* (2015) 61 Cal.4th 1244, 1268.)

Under the direct theory, the prosecution "must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 279.) "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile, supra*, 10 Cal.5th at p. 848.)

Under the indirect theory, where the offense that "the perpetrator actually commits is *different from the originally intended crime*, the natural and probable consequences doctrine limits liability to those offenses that are reasonably foreseeable consequences of the act originally aided and abetted." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108, italics added.) Under the natural and probable consequences theory as it previously applied to aiding and abetting murder, "a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.) "Vicarious liability is imposed 'for any offense committed by the direct perpetrator that is a natural and probable consequence of the

target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant.' " (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1007.)

**C.** *Analysis*

The record of conviction, including the instructions given in this case, show that appellant was convicted based on the direct theory of aiding and abetting with the intent to kill, and not on an indirect theory based on imputed malice.

The jury was instructed that first degree murder was murder "perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person outside of the vehicle *when the perpetrator specifically intended to inflict death….*" (Italics added.) CALJIC No. 3.01 defined an aider and abettor as a person who, "*with knowledge of the unlawful purpose of the perpetrator*," and "*with the intent* or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime." (Italics added.)

The jury was thus instructed, and appellant was convicted of, first degree murder on the direct theory of aiding and abetting murder as stated in section 189, subdivision (e)(2), that appellant "was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree." (§ 189, subd. (c)(2).)

As noted by appellant, however, the jury was also instructed with CALJIC No. 3.02, about the liability of aiders and abettors under the natural and probable consequences doctrine:

> "One who aids and abets another in the commission of a crime is not only guilty of that crime but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.

"In order to find the defendant guilty of the crime of murder in the first degree, as charged in Count 1, you must be satisfied beyond a reasonable doubt that:

"(1) The crime of discharging a firearm at another person from a moving vehicle *with the specific intent to kill* was committed,

"(2) The defendant aided and abetted such crime,

"(3) A co-principal in such crime committed the crime of discharging a firearm at another person from a moving vehicle with the specific intent to kill, and

"(4) *The crime of murder was a natural and probable consequence of the commission of the crime of discharging a firearm at another person from a moving vehicle with the specific intent to kill.*" (Italics added.)

While this instruction may raise the possibility that appellant could have been convicted under a "natural consequences" theory subsequently eliminated by Senate Bill 1437, the record establishes the jury did not find appellant guilty of first degree murder under a prohibited imputed-malice theory. "Under the natural and probable consequences theory of aiding and abetting a murder, a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez*, *supra*, 22 Cal.App.5th at p. 683.)

"[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) " 'To prove that a defendant is an accomplice … the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's

29.

criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense—murder or attempted murder—are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*Ibid.*, fn. omitted.)

In this case, to the extent the jury was instructed on natural and probable consequences, the instructions identified the target offense as first degree murder—that the murder was "perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person outside of the vehicle *when the perpetrator specifically intended to inflict death….*" (Italics added.) More importantly, the instructions identified the purported nontarget offense was also murder: "*The crime of murder was a natural and probable consequence of the commission of the crime of discharging a firearm at another person from a moving vehicle with the specific intent to kill.*" (Italics added.)

We thus conclude the jury was required to find that appellant shared the perpetrator's intent to discharge a firearm at another person from a moving vehicle with the specific intent to kill and, to the extent that CALJIC No. 3.02 use the phrase "natural and probable consequences," the instruction further stated that murder was the consequence of the perpetrator's intent to discharge a firearm with the specific intent to kill, so that appellant was convicted of first degree murder as a direct aider and abettor.

Appellant separately argues the instructions erroneously included a felony-murder theory that allowed the jury to convicted him of first degree murder regardless of whether he had the intent to kill. Appellant's argument is based on language in CALJIC No. 8.10 that defined murder as the unlawful killing of a human being with malice aforethought "or during the commission or attempted commission of willfully and maliciously discharging a firearm at another person from a moving vehicle, *a felony inherently dangerous to human life….*" The instruction stated the elements were that a human being

30.

was killed, the killing was unlawful, and "[t]he killing was done with malice aforethought *or occurred during the commission or attempted commission of the crime of willfully and maliciously discharging a firearm at another person from a moving vehicle, a felony inherently dangerous to human life.*"  (Italics added.)

As explained above, first degree drive-by murder under section 189 is not felony murder "because it requires a mental state that felony murder does not require."  (*Chavez, supra*, 118 Cal.App.4th at p. 386.)  "[A]lthough premeditation is not required to establish first degree murder under this clause, a specific intent to kill is required.  And, as is well established, proof of an unlawful intent to kill is the functional equivalent of express malice."  (*Id*. at pp. 386–387.)

Instructions are judged in their entirety and not in isolation.  (*People v. Wilson* (1992) 3 Cal.4th 926, 943.)  The jury was correctly instructed on the direct aiding and abetting theory for first degree murder, and we presume the jurors followed the court's instructions.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1211; *People v. Scott* (2015) 61 Cal.4th 363, 399.)  In that context, the final phrase of CALJIC No. 8.10 "must have been understood, and dismissed, by the jury as mere surplusage.  [Citation.]  It cannot be held to have resulted in a 'miscarriage of justice.'  [Citation.]  It was too insignificant to have affected the outcome within a 'reasonable probabilit[y],' as required by *People v. Watson*[, *supra*,] 46 Cal.2d [at p.] 837 …."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 280, conc. opn. of Mosk, J.)  Applying the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, the erroneous inclusion of the phrase cannot be said to have " 'had substantial and injurious effect or influence in determining the jury's verdict.' "  (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58.)

## DISPOSITION

The court's order of September 2, 2020, denying appellant's section 1170.95 petition, is affirmed.